## WEYMAN v. PEOPLE.

*Larceny — obtaining possession by trick — distinction between larceny and obtaining property by false pretense. Evidence — like acts to prove intent.*

The prisoner, a dealer in jewelry, sent a memorandum order to K., another jeweler, for six pairs gold bracelets. The order was designed and understood to be an application for the articles to enable prisoner to sell some of them to a customer, and that he should return the articles unsold, and the money for such as were sold. *Held*, that the title to the articles until sold remained in K., and the appropriation of them to his own use by prisoner was larceny.

The difference between such an act and the obtaining of property by means of false pretenses consists in the circumstance, that in the latter the owner intends to part with his title with the change of custody, while in the former no such intention exists.

Evidence on the part of the people that on the same and next day the prisoner, on like orders, procured jewelry, which he failed to return, from other dealers besides K.; *held*, admissible to show felonious intent.

ERROR to the New York oyer and terminer to review the conviction of the plaintiff in error, George Weyman, for grand larceny. Sufficient facts appear in the opinion.

*Wm. F. Kintzing*, for plaintiff in error.

*Horace Russell*, for the people.

Present — DAVIS, P. J., BRADY and DANIELS, JJ.

DANIELS, J. It appeared upon the trial that the prisoner on the 24th of November, 1874, sent what was known as a memorandum order to Charles Kuhn & Co., jewelers, carrying on business at 18 John street, in the city of New York, for six pairs of gold band bracelets, which were thereupon sent to him by that firm. The prisoner was engaged in the same business, and in its transactions the order was designed and understood to be an application for the articles mentioned in it, for the purpose of showing them to a customer and enabling him to inspect them and select out of the number sent which, if either, he would take, and if he accept either that the money for that, with the remainder of the articles, should be returned to the persons sending them on the order. And the evidence tended very directly to show that such was the character of this transaction between the prisoner and Kuhn & Co. But neither the articles sent to him nor the money for either of them was at any time returned by him.

Upon these facts it was objected by the prisoner's counsel that he could not be convicted of larceny, because upon the delivery of the articles both the title to them and their possession passed to him. But this position cannot be maintained, for the title certainly did not pass. The property under the arrangement remained in Kuhn & Co., in all the articles not sold by the prisoner. He had the power to sell and transfer the title to such of the articles as he

might dispose of in that manner. But until a sale was made the title was in no respect changed. It continued uninterruptedly in the persons from whom they were procured, as long as no sale was made by the prisoner. That was clearly the design and effect of the transaction. It was not its purpose that the title in any event should pass to the prisoner. He was the mere custodian of the property for the person sending it to him. And if he acquired that feloniously, for the purpose of depriving the owners of it by means of the artifice he made use of to obtain it, that was sufficient, within the rule sanctioned by the authorities, to constitute the crime of larceny. Wharton's Crim. Law (4th ed.), §§ 1847–1852; *Hildebrand* v. *People*, 3 N. Y. Sup. 82; S. C., 56 N. Y. 394; *Smith* v. *People*, 53 id. 111. Whether he did or not was a question for the jury, under the evidence given in the case, and that was fairly submitted to them for their determination. The distinction between this class of cases and those of obtaining property by means of false pretenses seems to consist in the circumstance that in the latter the owner intends to part with his title with the change of custody, while in the former no intention of that kind exists.

The people were allowed to show that the prisoner, on the same day, and the day following that on which he procured these articles from Kuhn & Co., in the same way, and by similar means, procured other articles of jewelry from other persons, and appropriated them to his own use. This evidence was offered and received for the simple purpose of establishing his intent to be felonious in obtaining those articles mentioned in the indictment. His counsel excepted to the ruling under which it was admitted, and now relies upon the exception for the reversal of the conviction. By the evidence, which was excepted to, it appeared that the prisoner, on the 24th of November, obtained from Smith & Hedges, jewelers, in Maiden lane, a set of diamond studs, worth $500, on a representation that he had a customer for them, and on the next day, the 25th, procured from R. S. Middleton, another jeweler in the same street, two gold watches on a similar representation, all of which were to be returned by him, unless they were purchased by the customers, and, in that event, the money was to be returned instead of the articles it might be received for. The three transactions occurred within two days, and their similarity in their leading features and characteristics justified the conclusion that they were pervaded and controlled by the same general intention.

It was intent manifested by three distinct acts. But that so far connected them as to render them all manifestations of the same purpose. It combined them in one felonious plan, each of which was but a portion of its execution. And the several acts were allowed to be shown in order to enable the jury to determine what was the intention of the prisoner in the one which was the subject of the indictment. That was the gist of the crime it was charged he had committed, and, ordinarily, proof of its existence must depend upon the circumstances attending the transaction.

In other cases where the intention with which an act has been performed has been a material circumstance to be ascertained, evidence of this description has been received. Where goods have been obtained by means of fraudulent representations, it has been held that, as the intent is a fact to be arrived at, it is competent to show that the party accused was engaged in other similar frauds about the same time, provided the transactions are so connected as to time, and so similar in their other relations, that the same motive may reasonably be imputed to them all. *Hall* v. *Naylor*, 18 N. Y. 588, 589; *Hennequin* v. *Naylor*, 24 id. 139; *Allison* v. *Matthieu*, 3 Johns. 235; *Rankin* v. *Blackwell*, 2 Johns. Cas. 198; *Bielshofsky* v. *People*, 5 N. Y. Sup. 277; *Commonwealth* v. *Eastman*, 1 Cush. 189.

The same thing is very common for the purpose of establishing guilty intents on trials for passing counterfeit money. And in many other cases mentioned in 3 Greenl. on Ev., § 15.

In *Stuart* v. *Lovel*, 2 Stark. 93, Lord ELLENBOROUGH declared that there was no doubt but that other libelous publications would be admissible in proof of the intent on the trial of an indictment for a libel. And in *Reg.* v. *Dossett*, 2 C. & K. 306, on an indictment for feloniously setting fire to a rick of wheat straw, proof was allowed to show that it had been previously set on fire by the prisoner firing a gun very near to it. In that case Justice MAULE held, that in many cases it is an important question whether a thing was done accidentally or willfully. If a person were charged with having willfully poisoned another, and it were a question whether he knew a certain white powder to be poison, evidence would be admissible to show that he knew what the powder was, because he had administered it to another person, who had died, although that might be proof of a distinct felony. In the case of uttering forged bank notes, knowing them to be forged, the proofs of other utterings are all proofs of distinct felonies. Several cases are added in a

note to this decision fully sustaining the principle mentioned by the court.

The case of *Reg.* v. *Richardson*, 2 Fost. & Finl. 343, is still more analogous to the present one. The trial was for embezzlement, and evidence was offered of similar errors in the prisoner's account before and after those forming the subject of the charges. This was objected to on his part, but the proof was held to be proper, and it was received by the court. And a decision quite similar was made on the trial of an indictment for the same offense in the case of *Commonwealth* v. *Tuckerman*, 10 Gray, 173. The case of *Reg.* v. *Geering*, 18 L. J. M. C. 215, went as far as the court did upon the trial of the prisoner. That was an indictment for murder by means of arsenic. And the prosecution proposed, and was allowed to show on the trial of the prisoner for poisoning her husband by arsenic, given him in tea prepared by her, that arsenic had been taken into the stomach of three of her sons at other times; that two of them had died of poison, and that the symptoms of all the four parties were the same; that they all lived with the prisoner, and formed part of her family; that she generally made the tea for them, cooked their victuals, and distributed the same to them on their leaving the house to go to their work in the morning. POLLOCK, C. B., held this evidence proper, and stated that ALDERSON and TALFOURD concurred with him. He added, in his decision, that it was not inadmissible, by reason of its having a tendency to prove a subsequent felony.

*Rex* v. *Mogg*, 4 C. & P. 364, was disposed of under the same principle. The prisoner was indicted for administering arsenic to horses, and the prosecution was allowed to show that it had been done by him on different occasions, merely as proper proof of his intent. *Rex* v. *Winkworth*, 4 C. & P. 444, was an indictment for robbery The prisoner went with a mob to the prosecutor's house, and one of the mob went to him and civilly, and as he believed with good intention, advised him to give them something to get rid of them, which he did. To show that this was not *bona fide* advice, but simply a mode of robbing the prosecutor, evidence was received of other demands of money by the same mob at other houses, at different periods of the same day, when some of the prisoners were present. And it was held by PARKE, J., to be proper, after a conference with VAUGHAN and ALDERSON, and in which Lord TENTERDEN

concurred. Other cases of the same general tenor will be found in Roscoe's Crim. Ev. (5th Am. ed.) 81–83, 94, 95.

The evidence which was received by the court, on the trial of the prisoner, seems to have been within the principle maintained by these authorities. If evidence of other criminal acts can be received, as it most certainly has been, with the sanction of the courts, for the purpose of proving the intent with which the act charged as criminal was committed, no good reason exists for excluding it in prosecutions for larceny. The intent is the vital fact to be ascertained. And other acts plainly within one common purpose or design have been allowed as legal evidence of it in treason, murder, robbery, arson, embezzlement, fraud and receiving stolen goods. *Copperman* v. *People*, 3 N. Y. Sup. 199; S. C., 56 N. Y. 591, and other cases. And no reason appears why larceny should not be included within the same principle.

The prisoner's counsel insists that it was a violation of the rule precluding the prosecution from proof of bad character when no evidence on that subject was given on his part. That rule does not include direct evidence of the prisoner's guilt. It relates to the general proof of character, and nothing else. Facts tending to prove the accused guilty of a specific crime may incidentally affect his character, as they certainly should, but that is no reason why they cannot be proved. If it were, no person could ever be proved guilty of a crime which he himself did not confess. The proof offered and received by the court was that of a fact constituting a material ingredient of the crime. It was direct proof of guilt in no sense in conflict with the rule invoked in support of the exception taken. The object of it was to show that the prisoner was probably actuated by one general intention, including all the property he managed to obtain on the three different occasions, and it had a direct tendency to exhibit the nature and character of that intent. It was received solely for that purpose, and directly tended to show an intention to steal when the property was procured, which was the subject of the trial.

The prisoner was rightly convicted, and the judgment should be affirmed.

*Judgment affirmed.*